Russ, Appellee and Cross-Appellant, *v.* TRW, Inc., Appellant and Cross-Appellee.

[Cite as Russ *v.* TRW, Inc. (1991), 59 Ohio St. 3d 42.]

(No. 89-1741—Submitted November 13, 1990—Decided April 24, 1991.)

*Carr, Feneli & Carbone Co.,
L.P.A.,* and *Leonard F. Carr; Judith
A. Lehnowsky,* for appellee and cross-
appellant.

*Jones, Day, Reavis & Pogue,
Patrick F. McCartan, Jr., Hugh R.
Whiting* and *Patricia A. Dunn,* for ap-
pellant and cross-appellee.

*Spater, Gittes, Schulte & Kolman,
Frederick M. Gittes, Law Offices of An-
drew J. Ruzicho* and *Louis A. Jacobs,*
urging affirmance for *amicus curiae,*
Plaintiff Employment Lawyers Assn.

SWEENEY, J.

I

The initial contention of appellant
challenges the jury verdict in favor of

appellee on the claim of intentional infliction of emotional distress. At the outset, appellant maintains that recovery on this basis is tantamount to recognizing a claim for wrongful discharge, which was rejected by this court in *Mers* v. *Dispatch Printing Co.* (1985), 19 Ohio St. 3d 100, 19 OBR 261, 483 N.E. 2d 150, as applied to the at-will employment context. Appellant has, however, mischaracterized the basis for the claim presently at issue.

As a preliminary matter, it must be observed that this court has recognized intentional infliction of emotional distress to be an independent tort. *Reamsnyder* v. *Jaskolski* (1984), 10 Ohio St. 3d 150, 152, 10 OBR 485, 487, 462 N.E. 2d 392, 394; *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 374, 6 OBR 421, 426, 453 N.E. 2d 666, 671. Thus, its character as a legally actionable injury is not dependent upon the existence of a contractual relationship between the litigants. Rather, recovery is predicated upon satisfaction of a standard applicable to a distinct type of tortious conduct. This standard, as set forth in the syllabus to *Yeager* v. *Local Union 20, supra,* provides as follows:

"One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

A review of the evidence clearly supports the jury determination that appellant had pursued a course of extreme and outrageous conduct in its relations with appellee which produced in him severe emotional distress. The pattern of behavior employed by appellant in misleading appellee into believing the pricing practices were legitimate, discharging appellee under circumstances designed to give the impression that he was responsible for the practices, and the subsequent targeting of appellee as a suspect in the federal investigation is completely substantiated by the record. Moreover, ample evidence was adduced to justify the conclusion that such acts produced severe emotional distress in appellee.

Appellant contends nonetheless that to permit an action for intentional infliction of emotional distress where such harm results from the termination of an at-will employee would, in essence, recognize a claim for wrongful discharge. This argument is without merit. An action for wrongful discharge is contractual or quasi-contractual in nature. See *Mers, supra.* In contrast, an action for intentional infliction of emotional distress seeks to redress tortious conduct. Secondly, the argument advanced by appellant proceeds from a false premise. The proximate cause of the emotional distress suffered by appellee is not limited to the mere fact of his discharge. Rather, the circumstances surrounding his discharge, including appellant's false characterization of appellee as an instigator of and willing participant in the pricing practices, were in large part the basis for the trauma which he experienced. This assault on his reputation, the efforts by appellant to make him the target of a federal investigation, and the prospect of engaging in the undercover investigation of his former colleagues together accounted for his emotional distress. The harm suffered by appellee was not limited to that produced by his discharge.

Appellant suggests, however, that liability for such acts may result only where the employer either specifically desired to injure the employee, or the employer knew that such harm was substantially certain to occur. In support of this view, appellant cites *Van*

*Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489.

The reliance by appellant upon *Van Fossen* is misplaced. The standard announced therein has as its purpose the determination of whether *workplace injuries* suffered by an employee were the result of an intentional action of the employer. See *id.* at paragraphs five and six of the syllabus. Resolution of this issue will determine whether the employee may pursue a civil action or whether workers' compensation is the sole remedy. *Van Fossen* and its progeny did not endeavor to redefine the requisite mental state for an intentional tort. Secondly, an action for infliction of emotional distress is cognizable irrespective of the particular mental state of the tortfeasor. This court has recognized that behavior of an intentional, reckless or negligent character resulting in such injury is actionable. See *Yeager* v. *Local Union 20, supra; Reamsnyder* v. *Jaskolski, supra; Schultz* v. *Barberton Glass Co.* (1983), 4 Ohio St. 3d 131, 4 OBR 376, 447 N.E. 2d 109. Finally, the acts of TRW supervisory personnel in inflicting emotional distress upon appellee cannot be considered acts within the scope of their employment. Appellant would readily acknowledge that TRW is not in the business of defrauding the federal government. Accordingly, acts of this nature are not part of the employment relationship and the damages suffered by appellee are not injuries sought to be redressed under the workers' compensation system.

Appellant further challenges the jury determination on the emotional distress claim by contending that the jury's response to Interrogatory No. 6A demonstrates that appellant did not engage in extreme and outrageous conduct in the termination of appellee. Appellant therefore maintains that the tort claim provides no greater remedy than that afforded by appellee's nonexistent contractual rights. That is, since there is no cause of action for wrongful discharge because appellee is an at-will employee and since there was no outrageous conduct in terminating appellee, there exists no basis for a finding of liability for emotional distress. However, this argument ignores the fact that the behavior of appellant which was not associated with termination is clearly actionable. Such behavior includes the acts of appellant prior to termination which set the stage for appellee's emotional distress and the acts of appellant subsequent to appellee's termination which exposed him to an intensive federal investigation. Secondly, there exists no conflict between the jury's determination that no outrageous conduct accompanied the termination and its further determination in Interrogatory No. 5 that appellant engaged in extreme and outrageous conduct. In this regard both interrogatories are consistent with the general verdict.

Moreover, appellant's reliance on the fact that the jury underlined the word "recklessly" on Interrogatory No. 5 is misplaced. As an initial matter, one is left to speculate as to the meaning of this notation. Appellant would have the appellate courts assume that the jury found that appellant's acts were *merely* reckless. However, it is pure conjecture as to whether this was the reason that the word was underlined.

Assuming, *arguendo,* that this was the basis for the jury finding, it is wholly immaterial. As mentioned previously, this court has recognized the torts of intentional or reckless infliction of emotional distress in *Yeager* v. *Local Union 20, supra,* and negligent infliction of emotional distress in *Schultz* v. *Barberton Glass Co., supra.* Accor-

dingly, it matters not whether the acts of the defendant are characterized as intentional, reckless or negligent. Damages resulting therefrom are recoverable under any of those theories.

We therefore hold that an action predicated upon intentional infliction of emotional distress brought by an at-will employee against his employer is not foreclosed merely because his discharge from employment was obtained in a lawful manner.

## II

Appellant also seeks reversal of the jury disposition of appellee's cause of action predicated upon fraud. A claim of common-law fraud requires proof of the following elements: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Burr* v. *Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St. 3d 69, 23 OBR 200, 491 N.E. 2d 1101, paragraph two of the syllabus; *Cohen* v. *Lamko, Inc.* (1984), 10 Ohio St. 3d 167, 169, 10 OBR 500, 502, 462 N.E. 2d 407, 409.

A representation which will serve as the basis for an action in common-law fraud is not confined to spoken or written words but may encompass conduct that amounts to an assertion not in accordance with the truth. See 3 Restatement of the Law 2d, Torts (1965), Section 525, Comment *b;* Prosser & Keeton, Law of Torts (5 Ed. 1984) 736-737, Section 106.

Moreover, an action in fraud is maintainable where false representations of an actor expose another to potential criminal liability. In this regard, Section 557 of the Restatement provides as follows:

"One who by fraudulent misrepresentations induces another to do an act that would be lawful if the representation were true but which is in fact unlawful is liable to the other for the loss that he incurs in consequence of the unlawfulness of the act thus induced."[4]

In the case at bar, all of the elements of common-law fraud have been satisfied. The overt manner in which the illicit pricing practices were pursued was clearly calculated to project an illusion of normalcy. Whether such activities are considered representations of legitimacy in themselves or whether the pattern of conduct was calculated to obscure their unlawful nature is immaterial from a legal standpoint. Either characterization yields the conclusion that the scheme constituted a false representation which was designed to mislead appellee, a man of limited knowledge, experience and authority, into believing that such practices were legitimate. That appellee, given his level of sophistication, would reasonably rely upon such representations is fully supported by the evidence. A review of the record demonstrates further that appellee did rely on such representations and that he suffered injury as a result.

---

[4] This result obtains irrespective of the ultimate resolution of the criminal proceedings. Thus, Comment *a* to Section 557 of the Restatement states in part:

"* * * The rule stated in this Section covers a case in which the person to whom the representation was made did not incur liability but has suffered other harm."

The emotional harm sustained by appellee was the subject of extensive testimony at trial. His termination under an ethical cloud by his employer of seventeen years for merely performing his assigned tasks and the sense of betrayal engendered by this treatment were direct causes of his psychological injuries. The aforementioned conduct, in itself, is sufficient to satisfy the elements of common-law fraud set forth in *Burr* and *Cohen*. Moreover, the misrepresentations to appellee by agents of appellant that the pricing practices were legitimate, his justifiable reliance thereon, the subsequent efforts by appellant to depict appellee as a principal in the scheme to federal authorities and his unenviable status as a target of the governmental investigation present the type of scenario sought to be addressed by the Restatement, particularly Section 557, which is uniquely tailored to situations where the fraudulent representations of one party expose another to criminal liability.

### III

While the court of appeals affirmed the jury determinations with respect to the claims of fraud and intentional infliction of emotional distress, it reversed the verdict in favor of appellee on the promissory estoppel claim. We are in agreement with this disposition.

It is beyond dispute that appellee was an at-will employee during his tenure at TRW. In *Kelly* v. *Georgia-Pacific Corp.* (1989), 46 Ohio St. 3d 134, 545 N.E. 2d 1244, this court reiterated the criteria for evaluating the legal implications of a particular employment-at-will relationship. Paragraphs two and three of the syllabus to *Kelly* provide as follows:

"The facts and circumstances surrounding an employment-at-will relationship, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the explicit and implicit terms concerning discharge. * * *"

"The doctrine of promissory estoppel is applicable to at-will employment relationships. The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee. * * *" See, also, *Mers* v. *Dispatch Printing Co., supra.*

Accordingly, an action for promissory estoppel is predicated upon the reasonable reliance by an at-will employee upon oral or written representations of his employer. A review of the record in the case at bar fails to reveal any evidence that appellee received oral or written promises of continued employment. Where such is the state of the evidence, there exists no legal foundation for a jury verdict based upon this theory of recovery. See *Karnes* v. *Doctors Hosp.* (1990), 51 Ohio St. 3d 139, 142, 555 N.E. 2d 280, 283. We therefore affirm the determination of the court of appeals that the motion for a directed verdict advanced by appellant on this claim should have been granted by the trial court.

### IV

Given the preceding disposition of the promissory estoppel claim, we are confronted with the same dilemma faced by the court of appeals. Inasmuch as the jury returned a general award of compensatory and punitive damages, it is unclear to what extent the promissory estoppel claim is represented therein. It is therefore necessary that a damage award be

determined on the basis of the surviving claims of fraud and intentional infliction of emotional distress.

Accordingly, the judgment of the court of appeals is affirmed and the cause is remanded for retrial on the issue of damages only.

*Judgment affirmed and cause remanded.*

DOUGLAS and RESNICK, JJ., concur.

H. BROWN, J., concurs in part and dissents in part.

MOYER, C.J., dissents separately.

HOLMES and WRIGHT, JJ., dissent.

H. BROWN, J., concurring in part and dissenting in part. While I concur in the syllabus law and Parts I, III, and IV of the opinion, I respectfully dissent from Part II of the opinion.

Russ claimed in his complaint that TRW defrauded him into participating in TRW's price-padding scheme by falsely representing that the price padding was legal. A claim of common-law fraud requires proof of a representation or concealment, material to the transaction at hand, made falsely with the intent to mislead the plaintiff, upon which the plaintiff justifiably relies to his detriment. *Burr* v. *Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St. 3d 69, 23 OBR 200, 491 N.E. 2d 1101, paragraph two of the syllabus; *Cohen* v. *Lamko, Inc.* (1984), 10 Ohio St. 3d 167, 169, 10 OBR 500, 502, 462 N.E. 2d 407, 409. Russ's claim fails to meet this standard on two critical points.

First, Russ has not produced any evidence that any TRW official directly told him that TRW's price-padding scheme was legal. The fact that TRW management apparently adopted this scheme, company-wide,[5] as a routine business practice, does not equate to a representation of legitimacy. As our society's long and unpleasant experience with drug abuse has shown, the "argument" that "everybody does it" is used to rationalize illegal activity, not to color it with legality.

Second, even assuming there had been some sort of misrepresentation, there is nothing in the record to suggest that Russ would not have been a "good soldier" and followed orders in its absence. Rather, Russ's own testimony was that he participated in

---

[5] TRW's counsel makes the claim that TRW, as a corporation, cannot possibly be considered a participant in the price-padding scheme because, it claims, "* * * TRW management, above the division level, knew nothing of the pricing scheme prior to * * * 1984." This argument fails for two reasons. First, it is undisputed that similar price-padding schemes were being investigated in four other TRW divisions. This raises at least the inference that these activities were part of an overall corporate policy.

Second, it is hornbook law that employers are considered to know what their employees know, and are responsible for their wrongful acts committed within the scope of their employment. *Higbee Co.* v. *Jackson* (1920), 101 Ohio St. 75, 128 N.E. 61; *Wellston Coal Co.* v. *Smith* (1901), 65 Ohio St. 70, 61 N.E. 143. In the case of a corporate entity such as TRW, the employer has no physical existence — it can only act or acquire knowledge through its employees. *State, ex rel. Celebrezze,* v. *Environmental Enterprises, Inc.* (1990), 53 Ohio St. 3d 147, 160, 559 N.E. 2d 1335, 1348 (H. Brown, J., concurring in part and dissenting in part). Because the employees of TRW's Airfoils Division were employees of TRW, their knowledge was TRW's knowledge, and their actions were TRW's actions.

the falsification of production hours, not because he was duped into believing it was legal, but because he was directed to do so by his superiors. Thus, Russ has failed to show any causal relationship between the purported misrepresentation and his own actions.

Accordingly, I would reverse the judgment as to the fraud claim, but affirm as to the emotional distress claim and remand for calculation of damages.

MOYER, C.J., dissenting. I respectfully dissent from the majority opinion for the reasons stated in the dissents filed by Justice Wright and Justice Brown.

WRIGHT, J., dissenting. I agree with Justice Brown's opinion finding no legal fraud on the basis of this record. However, I would go further insofar as I disagree with the majority's finding of tortiously outrageous conduct compensable outside of the workers' compensation system.

For more than ten years, Russ engaged in a pattern of activity to defraud the United States government. Nowhere in the record is this obvious fact rebutted. Yet Russ has somehow convinced my colleagues in the majority that during this lengthy time frame he was duped into this behavior by his immediate superiors with the explanation that this activity was necessary to make "a fair profit." As Judge J. F. Corrigan aptly noted in his dissent in the court below, this conclusion "defies logic" in the face of the course and nature of Russ's conduct. For ten long years, Russ falsified documents that he *knew* inflated the price on military contracts and *then ordered the original documents destroyed to cover up the act.* Yet my colleagues can't seem to fathom the notion that Russ knew that his conduct involved serious wrongdoing. Russ acknowledged feeling "uncomfortable" when performing these criminal acts and yet relayed his reservations only to his immediate boss. Russ's discomfort was later assuaged by a grant of immunity from the prosecution in exchange for his testimony against that same individual.

Accepting for the moment the unlikely assumption that Russ did not know he was engaging in wrongful conduct, Russ is still not entitled to compensation for "intentional or reckless infliction of emotional distress." Justice Sweeney, writing for this court, adopted the following explanatory language from the Restatement in explaining this tort:

" '* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found *only* where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' " (Emphasis added.) *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 374-375, 6 OBR 421, 426, 453 N.E. 2d 666, 671, quoting 1 Restatement of the Law 2d, Torts (1965) 73, Section 46, Comment d.

Just what did TRW do that was so

outrageous? The majority relies on three things: (1) the actions of Russ's supervisors to "mislead" Russ into believing his behavior was not criminal; (2) Russ's departure following TRW's internal investigation, which left Russ with the impression he engaged in criminal conduct; and (3) TRW's act of releasing the results of its investigation to the United States government, thus implicating Russ in criminal activity.

As to the first of these three acts, liability against TRW arises from the conduct of TRW's agents, Russ's supervisors, only if Russ's supervisors were acting within the scope of their actual or apparent authority. In such a case, Russ's injury arises within his employment and his remedy, if any, is limited to the workers' compensation system. However, to avoid this result, the majority finds that these acts were committed outside the scope of employment and, hence, outside the scope of the supervisors' authority. Then, without any explanation — no more than a wink and a nod — the majority attributes these acts to the corporate entity to support liability outside the workers' compensation system.

It escapes me how the acts of one employee in supervising another employee can result in liability of the employer outside both the workers' compensation system and Ohio's em-ployer intentional tort exception to workers' compensation. See *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, 522 N.E. 2d 477. The acts of a supervisor in supervising an employee are by definition within the scope of employment. Hence, this claim should be either decided under the workers' compensation system or retried as an employer intentional tort case under the appropriate legal standard.[6]

The other two activities relied upon by the majority are anything but outrageous. Upon discovery of the fraud, TRW conducted an internal investigation that clearly implicated Russ and others in criminal behavior. As a result, TRW discharged Russ as well as others and turned the results of its investigation over to the federal authorities.

What would the majority have had TRW do? What public policy message is the majority sending? The majority appears to place corporations on notice that if they catch miscreants in their midst engaging in criminal conduct, they should neither fire them nor turn them over to law enforcement officials because if they do, civil liability might accrue. This is plainly bad law and even worse public policy. It is also a message from which I dissent.

HOLMES, J., concurs in the foregoing dissenting opinion.

---

[6] To prove an employer intentional tort, the employee must provide "* * * proof beyond that required to prove negligence and beyond that to prove recklessness. * * *" *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, 139, 522 N.E. 2d 477, 481.

In contrast, the tort in this case is "intentional or reckless infliction of emotional distress," and, more tellingly, the jury underlined the word "recklessly" on the relevant interrogatory suggesting that the jury did not believe an intentional tort occurred.

| Div. Controller | Div. Quality Mgr | Division Sales Mgr | Div Engineering Mgr |
|---|---|---|---|
| Larry S. Eagleye | | Rudolph G. Christiansen Retired | Herbert C. Pekarek |
| Richard Kavicky | James V. Peck | | Arthur R. Disbrow |

| Larry S. Eagleye | James Kuharik | Mfg Engng Pans | Mfg Engng Vanes |
|---|---|---|---|
| Raymond S. Oliger | Ralph H. Pettifer | John J. Kusner | Eugene J. Malin |
| Alan J. Russ | | | |

John D. Snowberger

Richard B. Bell

John M. Kolosai

Susan M. Evans

Anthony F. Berzin

Walter S. Knapp

Emil R. Shaw

Oliver T. Richardson

Christopher T. Swyt

John E. Nelbecker

| Edward P. Baron | John J. Fildoro |
|---|---|
| Harry J. Davidson | William J. Gehlfuss |
| Dennis M. Kovalski | George J. Gides |
| John D. Lunato | David B. Hamilton |

NOTE:  Chart Depicts Relative
Reporting Relationships –
Assignments Shown Were Current
At Time of Policy Violation.

```
                          ┌─────────────────┐
                          │   VP and DM     │
                          │                 │
                          │ Robert A. Paetz │
                          │    Retired      │
                          └─────────────────┘
```

| Product Line Mgr Vanes | Product Line Mgr Fans | Product Line Mgr HPB | Danville Plnt |
|---|---|---|---|
| James P. Wiles Retired | Charles W. Broome | Donald W. Liechty Herbert C. Pekarek | James V. Peck Stanley F. Stein Retired |

| Mfg Engng HPB | Mgr Industrial Engng | Unit Manager | Controller |
|---|---|---|---|
| Richard R. Reimer | Thomas E. Edwards Retired | Leslie E. Meilander Edward A. Lepish Matthew M. Mlodzlkovski | Rollin W. Tinsley Retired |

Engineering Srvs

Joseph J. Silvestro

Sylvia M. Beck

Walter F. Mensch

Foreman,
Walter D. Piunno      Alan D. Ring        Wayne A. Whittington

R. Woodrow Ramey      Timothy S. Rubal    Henry A. Zielinski

Woodford G. Resnick   Roger J. Tracey

Lloyd G. Rhodes       Sue Vocaturo